**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 949-2909
Christopher F. Graham, Esq.
Sarah H. Morrissey, Esq.
cgraham@eckertseamans.com
smorrisesey@eckertseamans.com

*Counsel for Adjusted Debtor and Defendant*
*Suffolk Regional Off-Track Betting Corporation*

**HEARING DATE: Nov. 28, 2018**
**HEARING TIME: 2:00 pm**
**OBJECTION DEADLINE: Nov. 12, 2018**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,<br><br>            Adjusted Debtor. | Chapter 9<br><br>Case No. 12-43503-CEC |
| JENNIFER TOMASINO, KEVIN MONTANO, RICHARD MEYER, and APRYL L. MEYER,<br><br>            Plaintiffs,<br><br>    -against-<br><br>INCORPORATED VILLAGE OF ISLANDIA, BOARD OF TRUSTEES OF THE VILLAGE OF ISLANDIA, DELAWARE NORTH ISLANDIA PROPERTIES, LLC, a/k/a DELAWARE NORTH, and SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,<br><br>            Defendants. | Adv. Proc. No. 18-1033-CEC<br><br><br>**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION** |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ......................................................................... 5

II.   PROCEDURAL BACKGROUND ..................................................................... 5

III.  LEGAL STANDARD ....................................................................................... 8

IV.   ARGUMENT ..................................................................................................... 9

A.    Counts I and II: LL 3-2017 is Not the Result of an Illegal Contract or Unlawful

Spot Zoning........................................................................................................... 9

B.    Count III: Dismissed ....................................................................................... 15

C.    Count IV: Plaintiffs are Unable to Articulate Damages and the Balance of

Hardships Undeniably Favors Suffolk OTB. ..................................................... 15

1.    *Plaintiffs Failed to Show they Suffered Irreparable Injury*...................................... 17

2.    *Plaintiffs Failed to Show that Remedies at Law are Inadequate to Compensate*

*Them* 23

1.    *Plaintiffs Failed to Show that The Balance of Hardships is in Their Favor* .......... 24

2.    *Plaintiffs Failed to Show that a Permanent Injunction Will Not Harm the Public*

*Interest* ................................................................................................................... 26

D.    Plaintiffs Lack Standing ................................................................................. 27

V.    CONCLUSION ............................................................................................... 29

## **TABLE OF AUTHORITIES**

## **Cases**

*A & G Research, Inc. v. GC Metrics, Inc.*, 19 Misc. 3d 1136(A), 862 N.Y.S.2d 806 (N.Y. Sup. Ct. 2008). ............................................................................................................. 17

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ................................................... 28

*Acumed LLC v. Stryker Corp.*, 551 F.3d 1323 (Fed. Cir. 2008) ..................................... 24

*Beare v. Millington*, No. 07-CV-3391 TLM, 2014 WL 1236750 (E.D.N.Y. Mar. 25, 2014) ........ 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 8, 9

*Church v. Islip*, 8 N.Y.2d 254 (1960) .................................................................. 11, 13

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .................................................. 17, 28

*Collard v. Flower Hill*, 52 N.Y.2d 594 (1981). ..................................................... 12, 14

*DePaolo v. Town of Ithaca*, 258 A.D. 2d 68 (N.Y. App. Div. 1999) ........................... 11, 12

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ................................... 16, 23, 24

*FDIC v. Great Am. Ins. Co.*, 607 F.3d 288 (2d Cir. 2010) ............................................. 8

*Icy Splash Food & Beverage, Inc. v. Henckel*, 14 A.D.3d 595, 596, 789 N.Y.S.2d 505, 506 (N.Y. App. Div. 2005). ......................................................................................... 16

*In re Citizens for Responsible Zoning v. Common Counsel of City of Albany*, 56 A.D. 3d 1060 (N.Y. App. Div. 2008). ....................................................................................... 14

*In re Monahan Ford Corp. of Flushing*, 390 B.R. 493 (E.D.N.Y. Bankr. 2008) ......................... 8

*In re Rogers*, 374 B.R. 510 (Bankr. E.D.N.Y. 2007) ....................................................... 8

*Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir. 1998) ....................................................... 9

*Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139 (2010) ......................................... 16

*Munaf v. Geren*, 553 U.S. 674 (2008) ...................................................................... 16

*Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15 (2000) ............................................. 16

*Rodgers v. Vill. of Tarrytown*, 96 N.E.2d 731 (1951) .............................................. 11, 14

*Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98 (2d Cir. 2011) .......................... 8

*Salazar v. Buono*, 559 U.S. 700 (2010) ................................................................... 16

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .......................................................... 16

*Shepard v. Vill. of Skaneateles*, 89 N.E.2d 619 (1949) ............................................ 10, 15

*Thomas v. June*, 194 A.D.2d 842 (N.Y. App. Div. 1993) ............................................... 10

*Tomasino v. Inc. Village of Islandia*, Case No. 23-43503-CEC, 2018 Bankr. LEXIS 2977 (E.D.N.Y. Bankr. Sept. 27, 2018) ........................................................... 8, 13, 15

*Tomasino v. Incorporated Village of Islandia, et. al*, No. 302780, 2018 N.Y. Misc. LEXIS 1865 (N.Y. Sup. Ct. May 14, 2018) ............................................................................... 7

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ..................................................... 16

*Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) ............................................ 10

*Weinberger v. Romero–Barcelo*, 456 U.S. 305 (1982) ................................................. 16

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000) .............................................. 9

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ........................................................ 15, 16, 23

3

## **Statutes**

N.Y. CLS Mun. H. R. § 10(1)...................................................................................... 11
N.Y. CLS Mun. H. R. § 10(4)...................................................................................... 11
N.Y. Const. art. I, § 9, cl. 1 ........................................................................................ 31
N.Y. Tax Law §671 ..................................................................................................... 31
Village of Islandia, N.Y., Code 3-2017 (1989) (effective Nov. 28, 2017). ............................ 15

## **Rules**

Federal Rule of Bankruptcy Procedure 7008............................................................. 21
Federal Rule of Bankruptcy Procedure 7056............................................................... 5
Federal Rule of Civil Procedure 56 ......................................................................... 5, 8
Federal Rule of Civil Procedure 65 ........................................................................... 18
Federal Rule of Civil Procedure 8(b)(5), .................................................................. 21

## **Treatises**

42 Am. Jur. 2d *Injunctions* § 11 .............................................................................. 19

The Adjusted Debtor and Co-Defendant, Suffolk Regional Off-Track Betting Corporation ("Suffolk OTB"), by and through its undersigned counsel, Eckert Seamans Cherin & Mellott, LLC, respectfully submits this Brief in Support of its Motion for Summary Judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 which incorporates Federal Rule of Civil Procedure 56, and in support thereof, avers as follows:

## I.    PRELIMINARY STATEMENT

Plaintiffs' claims are speculative and lack factual merit, and as such, do not justify the various forms of relief they seek in this case.

Despite extensive discovery, Plaintiffs are unable to articulate any actual damage that they have suffered or will suffer which would substantiate a ruling in their favor under any of their asserted claims, including for a permanent injunction. Rather, it is evident that Plaintiffs have simply assembled a host of unsupported contentions based solely on personal stereotypes and conclusory generalizations as to the effects of a VLT Facility on the Village of Islandia which are not rooted in reality.

Accordingly, there is no material issue of fact that justifies the imposition of Plaintiffs' requested relief for various rulings and a permanent injunction, and Suffolk OTB is entitled to summary judgment. Furthermore, Plaintiffs are not entitled to a permanent injunction for two fundamental reasons. First, they cannot prove a likelihood of success on either of their contract zoning or spot zoning claims. Second, they have not produced any meaningful evidence of factual harm—much less irreparable harm to themselves. This case should be dismissed.

## II.    PROCEDURAL BACKGROUND

Suffolk OTB filed a petition for relief under Chapter 9 of the Bankruptcy Code on May 11, 2012. (Ch. 9 Vol. Pet. May 11, 2012). Suffolk OTB filed a second amended plan for the adjustment

of Suffolk OTB's debts and a second amended disclosure statement on September 11, 2014. (Second Am. Ch. 9 Plan, Sept. 11, 2014; Second Am. Discl. Stat. Sept. 11, 2014). The second amended plan was confirmed after a hearing on October 22, 2014 (the "Plan"). (Confirmed Plan Oct. 22, 2014). The Plan provides for the construction of a Video Lottery Terminal gaming facility ("VLT Facility") in Medford, New York. Suffolk OTB made efforts to open the VLT Facility in Brookhaven, New York but encountered significant difficulty with the Board of Brookhaven, New York; so much so that Suffolk OTB successfully appealed to this Court to order Brookhaven to consider its application for a building permit, given that Brookhaven was violating its own laws by refusing to at least consider Suffolk OTB's application. *See In re Suffolk Regional Off-Track Betting Corp.*, 542 B.R. 72, 86 (E.D.N.Y. Bankr. 2015).

Suffolk OTB subsequently decided to instead build the VLT Facility in Islandia, New York, at the site of the former Marriott Hotel located at 3635 Express Drive North, Islandia, New York, 11749 (the "Premises"). Delaware North Islandia Properties, LLC ("Delaware North") is the present owner of the Premises.

The Premises is part of and subject to a zoning mater plan for the Village of Islandia ("Master Plan"), which was adopted by the Board of Trustees of the Incorporated Village of Islandia (the "Village Board") in November 1994. The Master Plan created an office/industrial district (the "District") which permitted office uses and accessory facilities. Hotels in the District were a permitted use by special exception and were not permitted to have multiple uses. On August 12, 2016, the Village Board approved the Special Permit Application and issued a special permit to Delaware North agreeing to permit Delaware North to use the Premises as a VLT Facility as an accessory use to the Premises in the District. On August 16, 2016, Delaware North and the Village

entered into The Taxpayer Relief Agreement (the "Agreement") which memorialized the agreement between Delaware North to make annual payments to the Village.

On September 13, 2016, the Plaintiffs and others commenced an Article 78 proceeding in State Court challenging the special permit granted by the Village Board, and the State Court issued a decision which vacated the special permit and found that the VLT Facility was not a permitted accessory use under the Village Code and Master Plan. *In re Tomosino v. Board of Trustees of the Inc. Vill. of Islandia,* 2017 N.Y. Misc. LEXIS 4635, at *12–13 (N.Y. Sup. Ct. Sept. 8, 2017). After the ruling, on November 28, 2017, the Village Board adopted LL No. 3-2017 ("LL 3-2017") which amended the Village Code to "provide for a Hotel/Gaming Facility as permitted use in the [ ] District," in order to permit the Premises to be used as a VLT Facility. Pursuant to LL 3-2017, the Village granted Delaware North a certificate of occupancy authorizing the use.

Plaintiffs Jennifer Tomasino, Kevin Montano, Richard Meyer, and Apryl Meyer filed the instant action on February 12, 2018 against Defendants, the Village, the Board of Trustees of the Incorporated Village of Islandia, Delaware North, LLC.  Suffolk OTB intervened and removed the case to this Court. *Tomasino v. Incorporated Village of Islandia, et. al*, No. 302780, 2018 N.Y. Misc. LEXIS 1865 (N.Y. Sup. Ct. May 14, 2018).  Plaintiffs' Amended Complaint, filed on July 26, 2018 asserted four causes of action against Defendants, including Suffolk OTB, with regard to LL 3-2017, seeking: (1) a ruling that Defendants unlawfully and improperly zoned by contract; (2) a ruling that Defendants engaged in improper spot zoning and requesting an injunction against Delaware North; (3) a ruling that the Village Board failed to comply with the mandatory referendum requirement prescribed by law; and (4) a permanent injunction against Delaware North.

This Court dismissed the Plaintiffs' third cause of action which alleged the Board violated Municipal Home Rule Law § 23(f) by adopting LL No. 3-2017 without a mandatory referendum on September 27, 2018. *Tomasino v. Inc. Village of Islandia*, Case No. 23-43503-CEC, 2018 Bankr. LEXIS 2977, at *6 (E.D.N.Y. Bankr. Sept. 27, 2018). The parties completed discovery on October 24, 2018.

### III.    LEGAL STANDARD

Fed. R. Civ. P. 56, incorporated by Bankruptcy Rule 7056(c), entitles a party to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011); *In re the Brunswick Hosp. Ctr., Inc.*, 399 B.R. 582, 586 (E.D.N.Y. Bankr. 2009).

In a motion for summary judgment, the moving party is charged to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the non-moving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). "[T]he existence of a factual dispute alone is insufficient to defeat a motion for summary judgment; the non-moving party must offer probative evidence tending to support its position." *In re Rogers*, 374 B.R. 510, 514 (Bankr. E.D.N.Y. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "No genuine issue exists 'unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *In re Monahan Ford Corp. of Flushing*, 390 B.R. 493, 499 (E.D.N.Y. Bankr. 2008) (quoting *Anderson*, 477 U.S. at 249–50). The non-moving party may not establish that there is a genuine issue to be resolved at trial through

mere allegations or denials of the adverse party's pleadings, but rather must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Beare v. Millington*, No. 07-CV-3391 TLM, 2014 WL 1236750, at *3 (E.D.N.Y. Mar. 25, 2014), *aff'd sub nom. Harris v. Millington*, 613 F. App'x 56 (2d Cir. 2015) (citing *Anderson*, 477 U.S. at 248–49); *Brunswick Hosp. Ctr., Inc.*, 399 B.R. at 586; *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (stating that conclusory allegations, speculation, or conjecture cannot defeat summary judgment).

Entry of summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof." *Celotex Corp.*, 477 U.S. at 317.

## IV.    ARGUMENT

Based on the facts as summarized above and detailed in the accompanying pleadings, there are no genuine issues of material fact regarding three causes of action asserted by the plaintiffs. There is no question that the Plaintiffs have the burden of proof on their claims in this adversary proceeding. They have utterly failed to articulate or assemble evidence sufficient to approach—much less carry—that threshold burden.

### A.    Counts I and II: LL 3-2017 is Not the Result of an Illegal Contract or Unlawful Spot Zoning

Plaintiffs also do not create a triable issue as to the merits of their contract or spot zoning claims, because they have failed to demonstrate a genuine issue of fact as to whether LL 3-2017 was a permissible zoning decision.

Regardless of the fact that Suffolk OTB is not a party to any contract with the Village, Plaintiffs' contract and spot zoning claims fail on their merits because the elements to each are not established: (1) The Village did not contractually limit its sovereignty and (2) LL 3-2017 was passed for the benefit of the Village—nor for the benefit of the Delaware North. (Dorman Dep. 166:16–21).

In New York, every local government has the power to adopt and amend its local laws to the extent that its actions are not inconsistent with the New York Constitution or general laws regarding property, affairs, or government. N.Y. CLS Mun. H. R. § 10(1).  Local governments are expressly permitted to delegate zoning and planning decisions to officers or agents of the local government. N.Y. CLS Mun. H. R. § 10(4).

Zoning laws are enacted "to promote the health, safety, and welfare of the community as a whole," despite the fact that oftentimes, this may "necessarily entail hardships and difficulties for some individual owners." *Shepard v. Vill. of Skaneateles*, 89 N.E.2d 619, 620 (N.Y. 1949).  With regard to zoning, "[w]hile precise delimitation is impossible, cardinal is the principle that what is best for the body politic in the long run must prevail over the interests of particular individuals." *Id.* (citing cases). The party challenging a zoning decision accordingly bears the burden to show that the regulation assailed is not justified.  *Shepard v. Vill. of Skaneateles*, 300 N.Y. 115, 118 (N.Y. 1949). Therefore, before a zoning ordinance can be held unconstitutional, Plaintiffs must establish that it is "clearly arbitrary and unreasonable, having **no relation** to the public health, safety morals, or general welfare." *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926) (emphasis added); *see also Thomas v. June*, 194 A.D.2d 842, 845 (N.Y. App. Div. 1993) (requiring "clear and convincing proof" of a benefit running with the land to find zoning change improper).

Zoning decisions effectuated by legislative action "[are] entitled **to the strongest possible presumption of validity**." *Church v. Islip*, 8 N.Y.2d 254, 258 (N.Y. 1960) (emphasis added). The broad power of the Village to change its zoning laws was clearly articulated and expressed long ago by the New York Court of Appeals in *Rodgers v. Vill. of Tarrytown*:

> While stability and regularity are undoubtedly essential to the operation of zoning plans, **zoning is by no means static**. Changed or changing conditions call for changed plans, and persons who own property in a particular zone or use district **enjoy no eternally vested right to that classification if the public interest demands otherwise. Accordingly, the power of a village to amend its basic zoning ordinance in such a way as reasonably to promote the general welfare cannot be questioned. Just as clearly, decision as to how a community shall be zoned or rezoned, as to how various properties shall be classified or reclassified, rests with the local legislative body; its judgment and determination will be conclusive, beyond interference from the courts, unless shown to be arbitrary, and the burden of establishing such arbitrariness is imposed upon him who asserts it**… Upon parties who attack an ordinance rests the burden of showing that the regulation assailed is not justified under the police power of the state by any reasonable interpretation of the facts. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.

96 N.E.2d 731, 733 (N.Y. 1951) (internal citations and quotations omitted) (emphases added).

Even where both parties to the contract provide consideration in exchange for a zoning decision, the zoning decision is not illegal unless it limits the legislative authority of the zoning body. *DePaolo v. Town of Ithaca*, 258 A.D. 2d 68, 71 (N.Y. App. Div. 1999). In *DePaolo*, the Ithaca Town Board entered into an agreement with Cornell University to rezone a segment of the town so that Cornell could route pipes from its campus through an enclosed loop under the local high school to a heat exchange facility where cool water from the Cayuga Lake could be pumped to cool the campus water. *Id.* at 70. In exchange for Ithaca amending the zoning ordinance to allow Cornell to run the cooling pipes under the high school, Cornell agreed to grant a license to Ithaca to ensure public access to certain lakeshore on Cayuga Lake for 99 years. *Id.* at 71. The court found that the agreement between Cornell and Ithaca was not illegal contract zoning because nothing in

the agreement limited Ithaca's future zoning authority or obligated it to approve Cornell's zoning application. *Id. DePaolo* demonstrates that "the modern view has evolved, recognizing the increased complexity of the development process and the benefits to local governments of large-scale, well-planned projects." 1 *Zoning and Land Use Controls* § 5.02 (2018). Indeed, New York courts specifically have held that:

> [P]ermitting citizens to be governed by the best bargain they can strike with a local legislature would not be consonant with the notions of good government, absent proof of a contract purporting to bind the local legislature in advance to exercise its zoning authority in a bargained-for manner, a rule which would have the effect of forbidding a municipality from trying to protect landowners in the vicinity of a zoning change by imposing protective conditions based on the assertion that the body is bargaining away its discretion, would not be in the best interests of the public.

*Collard v. Flower Hill*, 52 N.Y.2d 594, 601 (N.Y. 1981). In short, "the best interest of the public" mandates—rather they proscribes—that local government "impose protective conditions" whenever they change zoning. *Id.*

Here, the Plaintiffs alleged in Count I of the Amended Complaint that LL 3-2017 was illegal contract zoning because Delaware North and the Village Board entered into contracts wherein the Village Board allegedly "bargained away and sold its zoning powers." (Am. Compl. I). However, Plaintiffs have not put forth any evidence that suggests that the Village's zoning powers are limited due to the zoning decision or its contract with Delaware North. Critically, nothing in the Restated Agreement indicates that the Village ceded any legislative authority.

Aside from their bare assertions in the Amended Complaint, the Plaintiffs have also failed to show any quid-pro-quo for the zoning change. In fact, far from personally benefitting Delaware North, the Restated Agreement runs with the land. (Restated Agreement ¶ 18). Second, the Agreement in February 2018 was not approved by the Village until after LL 3-2017 was passed. VILLAGE OF ISLANDIA, N.Y., CODE 3-2017 (1989) (effective Nov. 28, 2017). Moreover, as

explained previously, even where a zoning decision is conditional, that does not render it *per se* illegal contract zoning. *Church v. Islip*, 8 N.Y.2d 254 (N.Y. 1960). Legislation "by contract" is invalid only in the sense that a legislature is not permitted to bargain away or sell its powers. *Id.* Here, there has been no such showing that the power of the Village Board has been limited or given to any other entity by enacting LL 3-2017; rather, the Restated Agreement, which postdates LL3-2017, preserves the Board's prerogative to this date and in the future to act in the best interests of the Islandia community.

Through its home rule powers, on November 28, 2017 the Village adopted LL 3-2017 to remove the prohibition on gaming facilities within the Village.[1] The Board's decision to amend the zoning ordinance via LL 3-2017 was unanimous—evidence that it was truly in the best interests of the community. When the Board passed LL 3-2017, it considered a multitude of factors including: "[T]he character of the community, the surrounding land uses, current zoning and master plan among other things." (Dorman Dep. 166:22–167:3, Oct. 19, 2018). *See Church*, 168 N.E.2d 680, 682 ( N.Y. 1960). To be clear, when the Board passed LL 3-2017, it was expressly acting in the best interests of the Village: "Whereas the Village of Islandia deemed that it was in the best interests of the Village and its residents to amend the Village Zoning Code, to, among other things, amend Section 177-3(B) to add definitions for Hotel/Gaming Facility and Game Room and to amend attachments 5 and 7 of Section 177, to add Hotel/Gaming Facility as a permitted use." (Resolution Approving Amended and Restated Taxpayer Relief Agreement Between the Village of Islandia and Delaware North Islandia Properties, LLC p. 1, Jan. 30, 2018; Dorman Dep. 166:16–21).

---

[1] This Court previously ruled that LL 3-2017 did not violate N.Y. Mun. Home Rule Law § 23(2)(f) even though it was enacted without a referendum. *Tomasino v. Incorporated Village of Islandia, et al.*, No. 12-43505-CDC, 2018 Bankr. LEXIS 2977, at *12–15 (Bankr. E.D.N.Y. Sept. 27, 2018).

The Plaintiffs additionally allege in Count II of the Amended Complaint that the Village's actions constituted unlawful spot zoning. (Am. Compl. Count II). Spot zoning is "the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner or such property and the detriment of other owners." *Rodgers v. Village of Tarrytown*, 302 N.Y. 115, 123 (N.Y. 1951). Even where a zoning decision involves only a single parcel of land, "the real test for spot zoning is whether the change is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community," i.e., if it the decision is reasonable in relation to neighboring uses. *Collard,* 52 N.Y. 2d at 600. "Unless shown to be arbitrary, the decision of the local legislative body to zone or rezone property is conclusive and beyond judicial interference." *Mahoney v. O'Shea Funeral Homes, Inc.*, 45 N.Y. 2d 719 (N.Y. 1978).

Plaintiffs have failed to meet their "heavy burden" to prove that the Village's legislative decision to expand the use of the Premises to also include a gaming use was illegal spot zoning. *In re Citizens for Responsible Zoning v. Common Counsel of City of Albany*, 56 A.D. 3d 1060 (N.Y. Sup. Ct. App. Div. 2008). For one, Plaintiffs have not put forth evidence showing that LL 3-2017 was not calculated to serve the general welfare of the community. In fact, Plaintiff Kevin Montano testified during his deposition that after he went to a public hearing regarding the issue whether to allow a gaming facility to open he learned "what a casino could bring to a town," the "pluses and negatives." (Montano Dep. 30: 17–21, Oct. 12, 2018). Moreover, as mentioned previously, Mayor Dorman testified that the Board considered a wide range of considerations when it calculated that allowing the VLT Facility was in the best interests of the Village. (Dorman Dep. 166:22–167:3; 166:16–21).

Accordingly, the decision to rezone was calculated and served the general welfare of the community, even if it did not comport with the preferences nor directly benefit the four individual Plaintiffs. In zoning decisions, such an impact on some individuals is permissible. *See Shepard v. Vill. of Skaneateles*, 89 N.E.2d 619, 620 (N.Y. 1949). ("While precise delimitation is impossible, cardinal is the principle that what is best for the body politic in the long run must prevail over the interests of particular individuals."). Here, the Board's decision was effectuated as it was beneficial to and in the best interests of the Village; the Plaintiffs' dissatisfaction with the decision, even if they do bear more of a negative burden due to the VLT Facility than other members of the Village community, does not establish that the decision to rezone was not calculated to serve the best interests of the Village. For these reasons and the reasons set forth in Defendant Delaware North's Brief in support of its Motion for Summary Judgment, the claims against Suffolk OTB for impermissible spot zoning should be dismissed.

### B. <u>Count III: Dismissed</u>

This Court previously dismissed Plaintiffs' claims that comprised Count III of the Amended Complaint on September 27, 2018. *Tomasino v. Inc. Vill. of Islandia*, Case No. 23-43503-CEC, 2018 Bankr. LEXIS 2977, at *6 (E.D.N.Y. Bankr. Sept. 27, 2018).

### C. <u>Count IV: Plaintiffs are Unable to Articulate Damages and the Balance of Hardships Undeniably Favors Suffolk OTB.</u>

Bankruptcy Rule 7065 incorporates Federal Rule of Civil Procedure 65 regarding injunctions. Fed. R. Bankr. P. 7065. A court must deny a permanent injunction unless the party seeking the injunction demonstrates all of the following circumstances: (1) that the seeking party suffered irreparable harm; (2) that remedies at law are inadequate to compensate the party for its injuries; (3) that a remedy in equity is warranted considering the balance of the hardship between the parties; and (4) that a permanent injunction would not disserve the public interest. *Winter v.*

*NRDC, Inc.*, 555 U.S. 7, 21, 32 (2008); *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). The burdens of production and persuasion are not shifted because one or more of the interested parties is involved in a bankruptcy procedure. *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000).

Moreover, though plaintiffs seeking a preliminary injunction may succeed by establishing that they are likely to succeed on the merits; plaintiffs that seek a permanent injunction bear a much higher burden — they must prove that they will actually succeed on the merits before a court can grant them a permanent injunction. *Winter*, 555 U.S. at 32; *Univ. of Texas v. Camenisch*, 451 U.S. 390, 392 (1981). It is also the plaintiff's burden to establish "that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).

An injunction is an extraordinary remedy and is not to be routinely granted: "It goes without saying that an injunction is an equitable remedy. It is 'not a remedy which issues as of course.'" *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–12 (1982) (quoting *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 US. 334, 337–38 (1933); *Salazar v. Buono*, 559 U.S. 700, 714 (2010); *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 165–66 (2010); *Munaf v. Geren*, 553 U.S. 674, 690 (2008); 42 Am. Jur. 2d *Injunctions* § 11 ("a permanent injunction should be granted sparingly, and only in clear cases").

One of the elements of a cause of action for a permanent injunction is that plaintiff will suffer irreparable harm absent the injunction. *Icy Splash Food & Beverage, Inc. v. Henckel*, 14 A.D.3d 595, 596, 789 N.Y.S.2d 505, 506 (N.Y. App. Div. 2005). In addition to alleging irreparable injury, a plaintiff must allege that other remedies are inadequate, and that a balancing of the

equities favors it. *A & G Research, Inc. v. GC Metrics, Inc.*, 19 Misc. 3d 1136(A), 862 N.Y.S.2d 806 (N.Y. Sup. Ct. 2008).

### 1.    *Plaintiffs Failed to Show they Suffered Irreparable Injury*

Plaintiffs failed to show any irreparable injury or a threat of actual future injury.

A permanent injunction is an equitable remedy which "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 501 (1974)).  Simply, equitable relief may not be awarded based only on speculative allegations regarding future injury. *Id.*  Plaintiffs have provided no fact that, even if true, would raise their speculations into the realm of reality.

First, Plaintiffs attempt to justify issuance of a permanent injunction based on the contention that their homes depreciated in value as a result of the VLT Facility, opening in no fewer than four paragraphs in their Amended Complaint and referencing "depreciation" suffered throughout. (Am. Compl. ¶¶ 77–79, 86).  However, all four Plaintiffs plainly testified that they were not aware that their home values actually depreciated at all, much less irreparably or in an amount that constituted "extreme hardship." (*See* Montano Dep. 22:14–24; R. Meyer Dep. 69:24–25, Oct. 12, 2018 ("I have no idea what it's worth."); A. Meyer Dep. 20:14–21, Oct. 15, 2018 ("Q: How much is your house currently worth? A: I would assume what we paid for it, but I'm not sure. I'm nervous to get an appraisal."); Tomasino Dep. 22:2–7, October 15, 2018 ("Q: How much is your home currently worth? A: I don't know.")).  Plaintiff Kevin Montano admitted that he hasn't lost anything as a result of the VLT Facility: "Q: Have you lost anything as a result of the operation of Jake's 58? A: No." (Montano Dep. 58:15–17).

Despite alleged "extreme hardship" suffered due to the VLT Facility, all four Plaintiffs testified that they have no intention of moving away from the VLT Facility in the near future. (Montano Dep. 22:25–23:1–6; R. Meyer Dep. 50:14–18; A. Meyer Dep. 91:18–23; Tomasino Dep. 22:13–20). In fact, Plaintiffs Apryl and Richard Meyer wanted to move before the VLT Facility was in place, but now have no intention of moving. In fact, Plaintiff Richard Meyer testified that he plans to live there for the rest of his life. (R. Meyer Dep. 50:14–18; 30:2–8); A. Meyer Dep. 20:20–21:15).

Plaintiffs actually cite no negative impact to their homes at all. For example, Plaintiff R. Meyer testified that: "Q: Have there been any physical changes to your house [since the VLT facility opened]? A: I don't think so, besides a couple bushes here and there." Q: So some additional improvements? A: Yes. Q: But nothing negative has happened to your house? A: No." (R. Meyer Dep. 66:30–57:4).

Additionally, the Plaintiffs allege in their Amended Complaint that they "are suffering and will continue to suffer extreme hardship and actual and impending irreparable injury, loss and damage" because they were being deprived of the benefits that were adopted by the Village Board when it adopted the Master Plan including the benefits of the values and commitments set forth in the Master Plan. (Am. Compl. ¶ 82). Despite the strong language about the virtue of the Master Plan as applicable to their homes — none of the four Plaintiffs have ever even read the Master Plan. (Montano Dep. 37:3–8 ("Q: Now, you've indicated you've never seen the Master Plan? A: No, I have not. Q: So you don't know what benefits are being referred to there? A: No."); R. Meyer Dep. 42:8–11; A. Meyer Dep. 87:20–22 ("Q: Have you ever seen the Village's Master Plan? A: No."); Tomasino Dep. 15:3–6 ("Q: Have you ever reviewed the Village's Master Plan? A: No.")). In fact, when asked about the meaning of Am. Compl. ¶ 82, Plaintiff Richard Meyer responded, "I

think a bunch of lawyers wrote this and it didn't really mean much to me." (R. Meyer Dep. 41:4–5).

The Plaintiffs also attempt to establish injury by contending that the VLT Facility caused and will continue to cause "local and more intense increase in crime rates, prostitution, public intoxication, gambling and drug addiction" as a result of Delaware North's use of the Premises as the VLT Facility. (Am. Compl. ¶¶ 78–79).  Yet, the Plaintiffs have again failed to provide any evidence that the crime rates have increased, let alone increased as a result of the VLT Facility.

For example, Plaintiff April Meyer testified that some of the allegations in the Amended Complaint were general allegations regarding what happens to communities when a gaming facility opens—not specific allegations as to the state of the Village residents as a result of the VLT Facility—stating: "I mean, first of all, some of these allegations are just based off what goes on in casinos in general." (A. Meyer Dep. 61:8–10).  The Plaintiffs' personal belief that prostitution exists in the VLT Facility is based on nothing but unsubstantiated gossip. (*See* A. Meyer Dep. 56:14–18 ("Q: Have you seen any evidence of prostitution? A: No, but it's what I've heard. Q: What have you heard? A: That there was prostitution going on in the casino and around the casino. Q: Who did you hear that from? A: Just people in the neighborhood"); 57:24–58:21 ("Q:  So you heard that from police officers that there was prostitution going on? A: We have friends that are police officers that work in that area. Q: And you heard that from them? A: Yes. Q: Can you tell me their names? A: Off the top of my head, we have a ton of friends that work over there. A: the ones what you had heard the prostitution stuff from. A: I'm not going to quote who just for their own, you know. Q: I need you to tell me who told you about the prostitution. A: I don't remember off the top of my head. We've spoken about this so many times with so many people and we have

a lot of police officer friends. Q: So you know it was a police officer, you don't know who exactly, right? A: No, not at this time.")

Plaintiffs alleged in their Amended Complaint that the VLT Facility is placing them at "life-threatening and otherwise severe felonious criminal conduct." (Am. Compl. ¶ 84). Yet, Plaintiff Montano admitted that: "Q: as you sit here today, other than the concerns you've testified to, you can't identify any injuries that you've suffered as a result of Jake's 58 operation? A: Injuries like personal injury? Q: Yes. A: Physical injury or emotional injury? Q: Let's start with physical injuries. Any physical injuries? A: No. Q: Let's talk about personal injuries. Any personal injuries? A: No. Q: Any property losses? A: No. Q: No thefts? A: No." (Montano Dep. 57:18–58:14). No one in the Tomasino-Montano family sought out medical or psychological help related to the VLT facility. (Montano Dep. 25:9–14). In fact, Plaintiff Apryl Meyer testified that: "Q: Have the police ever filed charges? A: No. Q: Why not? A: As per our complaints? Q: Yes. A: It was never anything, you know, significant enough for them to have to charge anyone." (A. Meyer Dep. 52:20–53:4).

Each Plaintiff's testimony amounts to nothing but anecdotal discussions of alleged instances of crimes that they supposedly witnessed but which are otherwise entirely unsubstantiated, and claims that these "incidents" were caused by the VLT Facility. For example, when Plaintiff Kevin Montano was asked how he measured the rate of public intoxication before and after the VLT Facility, he testified: "I mean, just in my situation what I've seen in, like, a different sense. Like, before the casino there were no – there was quiet in the parking lot and since, like you hear music loud." (Montano Dep. 34:15–19). When asked why he believes there is an increase in drug addiction, Plaintiff Montano responded "[b]ecause you have more lower income people undesirable that have a gambling issue and that's all it brings." (Montano Dep. 34:7–9).

Plaintiff Apryl Meyer put forth similarly unsubstantiated instances of crime. When asked if she'd ever seen anyone who was publicly intoxicated on Dawson Court other than her testimony on the first night, she responded: "Publicly intoxicated—I mean, I can't tell who's walking and who's drunk and who's not, but I'm assuming the few weird ones that are lingering in the woods are probably on something, but that's my assumption. Q: Right, you don't know for sure? A: No, I wouldn't know." (A. Meyer Dep. 105:2-11).

Plaintiffs' generalizations and suppositions are just that: anecdotal. Anecdotes, speculation, and fear simply do not serve to support that there is an increased rate of crime or that Plaintiffs are subject to the future threat of any crime.

In addition to the Plaintiffs' inability to articulate an instance of any harm, they also were unable show that any harm allegedly suffered is irreparable; indeed, the Plaintiffs testified to numerous efforts that could be put in place to mitigate or even remove some of their concerns (in the absence of an injunction). For example, Plaintiff Tomasino testified at length that, as a result of the VLT Facility, there was increased light coming into her daughter's bedroom, apparently from the headlights in the Premises parking lot. (Tomasino Dep. 45:3–48:14). Plaintiff Meyer also cited the increase in light coming into the Tomasino's daughter's room as a source of concern.

 (R. Meyer Dep. 48:7–12). Despite this fact, Plaintiffs have not suggested that this increased light cannot be reasonably mitigated in some other fashion, or that it justifies a permanent injunction enjoining the entire use of the VLT Facility. For example, personnel from the VLT Facility were amenable to helping address and even took action which eliminated some their complaints. (A. Meyer Dep. 77:22–25) (testifying that after she complained of noisy dumpsters, the VLT Facility personnel fixed the problem completely). Even though the VLT Facility were, in Plaintiff Tomasino's own words "so nice," she still was, again in her own words, "fucking screaming [her]

head off" at the personnel. (Tomasino Dep. 51:18–20). The Plaintiffs are not entitled to an injunction because their concerns could still be addressed in the absence of equitable relief, just as their concerns about the noise from the dumpsters were in fact resolved.

In fact, Plaintiffs admitted that there are other opportunities to help mitigate some of the concerns which could be effectuated without an injunction. For example, a more substantial fence between the VLT Facility and the Plaintiffs' homes may mitigate some of their concerns, as Plaintiff Richard Meyer suggested. (R. Meyer Dep. 21:3–12) (testifying that a more substantial fence could help mitigate the light shining into the Tomasino-Montano home at night from the parking lot). These potential remedies to Plaintiffs' concerns heavily weigh against a finding of irreparable harm.

Additionally, just as Plaintiff Apryl Meyer testified that the Village responded to her concerns and installed lampposts on their street, perhaps efforts such as these could be effectuated to mitigate the Plaintiffs' concerns that are less drastic and immutable than a permanent injunction. (A. Meyer Dep. 85:5–12). Plaintiff Richard Meyer explained that at one point, there was valet parking on their side of the parking lot which helped to mitigate their concerns. (R. Meyer Dep. 21:14–24).

Furthermore, Plaintiffs Montano and Tomasino testified that they never discussed concerns or potential remedies with any representative of Suffolk OTB, and by failing to do so, they ignored a valuable opportunity to utilize remedies available to Suffolk OTB. (Montano Dep. 40: 6–14; Tomasino Dep. 59:19–60:2). Instead of seeking out a peaceable solution, the Plaintiffs initiated the lawsuit seeking a permanent injunction rather than take the time to problem-solve and learn whether their harms were irreparable, ignoring obvious avenues that could have helped the

Plaintiffs mitigate their concerns in the first place.[2] Plaintiffs made the Defendants their adversaries by instituting a lawsuit instead of working through the non-litigious solutions that the Plaintiffs testified exist.

Post-discovery, no fact substantiates that the use of the Premises as a VLT Facility has presently, or will pose in the future, an irreparable injury to the Plaintiffs. Suffolk OTB acknowledges that the plaintiffs are annoyed by the Premises' new use as the VLT Facility. However, anecdotal evidence of "annoyance" does not establish before this Court that the Plaintiffs have suffered "irreparable harm," or will continue to suffer "irreparable harm." *See Winter* 555 U.S. at 21, 32; *eBay Inc.,* 547 U.S. at 391. Without these elements, Plaintiffs simply cannot establish their claim for permanent injunction.

Additionally, it is worth noting that in light of Plaintiffs' holistic failure to apprise themselves of the value of their homes or seek out potential non-legal remedies that they admittedly knew to exist before demanding a permanent injunction for their alleged "irreparable harm," is a grave misuse of the justice system.

## 2.    *Plaintiffs Failed to Show that Remedies at Law are Inadequate to Compensate Them*

Plaintiffs cannot show that a remedy at law is inadequate to compensate them for their injuries, because, in failing to establish any actual injury, they are not *entitled* to any remedy at law (and by extension, are not entitled to any equitable remedy).

As explained previously herein, Plaintiffs have set forth no fact that provides a basis for them to recover on any legal basis, let alone that such recovery would be insufficient.  Plaintiffs cannot accurately state that the value of their land has been destroyed or that they have suffered

---

[2] To the extent that Plaintiffs' assert that seeking redress with Suffolk OTB other that litigation would have been futile, Suffolk OTB was (and still remains) amenable to discuss potential remedies for the Plaintiffs' concerns prior to litigation. (Gazes Aff. ¶ 9).

any other financial or economic harm (or any other type of harm).  *See* discussion *supra* at Section IV(C)(1).  For example, all four of the Plaintiffs testified that they continue to use their property as a home—an economically viable use; moreover, each of the four Plaintiffs testified that they did not know how much their home value diminished, if it diminished at all as a result of the zoning decision.  No Plaintiff has articulated a calculation of any actual losses they've suffered. (*See e.g.*, R. Meyer Dep. 63:23-64:2).

In fact, the Plaintiffs introduce evidence of affirmative benefits that they have received. The evidence has demonstrated that LL 3-2017 *advanced* legitimate government interests, such as bringing commerce to the Village; Plaintiff Kevin Montano testified that he learned about the benefits of a gaming facility opening for a community. (Montano Dep. 30:17–21).   Because the LL 3-2017 considered the legitimate interests of the Village and did not deprive the Plaintiffs' properties of any economic viability, it was not a taking, there is no alleged legal injury, and therefore, the Plaintiffs could not seek a remedy at law (even an inadequate one).  By extension, without an adequate legal remedy, they are simply unable to obtain equitable relief.  Without suffering any injury, they are unable to establish that they are subject to or threatened with repeated injury in the future sufficient to justify imposition of a permanent injunction.  *See Lyons*, 461 U.S. at 102.  Plaintiffs do not deny that their Village taxes were reduced approximately 50% as a result of the VLT Facility opening.

### *1.*   *Plaintiffs Failed to Show that The Balance of Hardships is in Their Favor*

The balance of hardships analysis contemplates the hardships of the plaintiffs and defendants only; the effect on third parties is irrelevant. *See eBay*, 547 U.S. at 391; *see also Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) The Plaintiffs are four individuals suing in their individual capacity, not a class action on behalf of the residents of the Village. (Am.

Compl. ¶¶ 1–5). Accordingly, the VLT Facility's alleged effect on the community is irrelevant for purposes of balancing the hardships except to the extent, if any, that the effect on the community actionably affects the Plaintiffs. There is no proof of such an effect on the Plaintiffs in this case.

Here, the Plaintiffs' have failed to establish that their property values diminished at all— for all the Plaintiffs know, their property values may have increased. (Montano Dep. 39:25–40:3 ("Q: has the home increased in value since you've bought it? A: I don't know."); R. Meyer Dep. 86:23– 87:8 ("Q: You don't know if the property's gone up in value, correct? A: I don't. Q: Is it fair to say that it may have gone up in value? A: There's always a hope and a prayer"); A. Meyer Dep. 20:17–25 ("Q: How much is your house currently worth? A: I assume what we paid for it, but I'm not sure. I'm nervous to get an appraisal.") (objection omitted); J. Tomasino Dep. 22:2–4 (Q: How much is your home currently worth? A: I don't know.")). Similarly, Plaintiffs failed to show that the crime rate near their homes increased as a result of the VLT Facility.

Plaintiffs have alleged that an injunction would not impose a hardship on Suffolk OTB because Suffolk OTB "is not the owner of the Premises, made no or insubstantial investment in the Premises' proposed use as the VLT Facility and would still have the right and ability to exist and do business by relocating its operations elsewhere in Suffolk County." (Am. Compl. ¶ 89). As detailed in the Gazes Affidavit, Suffolk OTB has invested over $50,000,000.00 in the VLT Facility to date. (Gazes Aff. ¶12).

However, Plaintiffs' position harshly downplays and ignores the hardship that Suffolk OTB will suffer if this Court grants the injunction. The sought-after injunction would impose the substantial burden on Suffolk OTB to write-off the over $50,000,000.00 it expended preparing the Premises for its use as a VLT facility. (Gazes Aff. ¶ 12). The injunction will force Suffolk OTB to close its doors in the Village, which will trigger several devastating consequences.

*First*, Suffolk OTB will lose revenue until it can enter and complete negotiations, certifications, an operational processes for opening a facility elsewhere—revenue it is reasonably counting on to be able to pay its bankruptcy creditors in accordance with the Plan.  (*See* Gazes Aff. ¶ 6).

*Second*, through October 2018, Suffolk OTB allocated over $4,600,000.00 of distributions to Class 4 unsecured creditors pursuant to the Confirmed Plan for its bankruptcy strategy. (Gazes Aff. ¶ 6(a)). If the plaintiffs' injunction is granted, Suffolk OTB will be unable to satisfy its bankruptcy creditors according to the Plan that was confirmed by the Court. (*See* Gazes Aff. ¶ 6).

*Third*, because of the lost revenue, it will be forced to lay off the almost two hundred (200) local individuals it employs. (*See* Gazes Aff. ¶ 6).

*Finally*, Suffolk OTB will no longer be making monthly contributions to education beyond its heretofore $120,848,925.00 in surcharges to educating the children of the community (Gazes Aff. ¶ 4). The Plaintiffs paint Suffolk OTB as a corporation with bottomless pockets of money such that these losses do not greatly affect its ability to conduct business. As this Court is well aware, that is an inaccurate depiction.  Suffolk OTB stands to suffer greatly if the injunction is granted—the Plaintiffs' alleged complaints do not outweigh the manifest hardships Suffolk OTB would suffer if this Court grants the permanent injunction.

## 2. *Plaintiffs Failed to Show that a Permanent Injunction Will Not Harm the Public Interest*

Moreover, it is not just Suffolk OTB that will suffer if the injunction is granted; the community and New York state public interest will suffer from the injunction.

*First*, the community will lose the benefit of Suffolk OTB investing in its educational efforts if it is forced out of the community by the Plaintiffs. Since the VLT facility opened, Suffolk OTB donated $120,848,925.00 to the State Education Fund. (Gazes Aff. ¶ 7). If Suffolk OTB is

forced out of the community, it will redirect the donations to a comparable effort for the benefit of its new community. (Gazes Aff. ¶ 7).

*Second*, the two hundred (200) local employees of Suffolk OTB will be forced into unemployment or a period of uncertainty waiting for Suffolk OTB to find another location. (Gazes Aff. ¶ 6(c)).

*Third*, the injunction sacrifices the commercial benefit the VLT Facility brings to the area—the very objective and purpose of the Village Board's calculated decision to allow the VLT Facility to exist in the community in the first place. Suffolk County was guaranteed approximately $13,000,000.00 in revenue from the first ten years of Suffolk OTB's VLT facility; Suffolk OTB is on track to meet that guarantee. (Gazes Aff. ¶ 8). However, if Suffolk OTB is forced out of its location, it will be unable to meet that guarantee because it will suffer a huge loss of revenue before it takes all the many steps required to open its doors in a new location within Suffolk County, if it can manage to do so at all.

*Fourth*, in fact, New York's policy, clearly expressed in the Bill of Rights of the New York Constitution and the New York Tax law, actually promotes gambling in order to support the public good. N.Y. CONST. art. I, § 9, cl. 1 (providing for the existence of legislature-approved lotteries to support education in the state); N.Y. TAX LAW §671 (Consol. 2018) (providing the state to withhold and tax lottery winnings to use for the public good).

### D.  Plaintiffs Lack Standing

The Plaintiffs have failed to show that their claims are ripe for judicial decision. An issue is only ripe when it is fit for judicial decision and the parties would suffer hardship if the court withheld a decision. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). As explained by the U.S. Supreme Court:

It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy. Plaintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions. **Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical**.

*City of Los Angeles v. Lyons*, 461 U.S. at 101–02 (internal citations and quotations omitted).

Here, Plaintiffs lack standing to assert a claim for a permanent injunction, as there is no action to enjoin which would prevent any harm from occurring.  Because the Plaintiffs have not shown that an injunction restraining the use of the Premises as the VLT Facility would stop or prevent Plaintiffs from suffering any hardship, now or in the future, the Plaintiffs do not assert an actual case or controversy and this Court is unable to afford injunctive relief. (*See* discussion *supra* in Section IV(C)(1)) (discussing plaintiffs' failure to establish that they suffered harm).

As mentioned above, all four Plaintiffs have testified that they have no present intention to sell their homes.  They have not alleged any cognizable economic injury suffered as a result of the implementation of LL 3-2017 allowing the VLT Facility in the Premises.  In fact, Plaintiffs all live in their homes, use their homes, and do not put forth any evidence that their homes values have decreased or that they have suffered any economic injury due to the conduct of Suffolk OTB. As such, Plaintiffs' claims are unripe for judicial determination.

Once again, Plaintiffs bear the burden of proof to support their claims in this adversarial proceeding and have wholly failed to establish even a question of fact that approaches, let alone satisfies, their onerous burden.

# V.    CONCLUSION

Plaintiffs have set forth no evidence beyond anecdotal speculation, which cannot, and does not, substantiate any claim they have asserted.

The zoning decision was a lawful exercise of the Village's home rule powers. Suffolk OTB acknowledges that the Plaintiffs are annoyed by the gaming operation; however the Plaintiffs failed to show that there is a genuine question of material fact that their claims are actionable. The Plaintiffs failed to show that their claims for illegal spot and contract zoning will succeed. Plaintiffs failed to show that there is a genuine question of material fact that they have been irreparably harmed as a result of the VLT Facility opening. To the contrary, Suffolk OTB has demonstrated conclusively that it and New York State will suffer dire consequences from the granting of a permanent injunction.

WHEREFORE, Suffolk OTB respectfully requests this Court grant its Motion for Summary Judgment.


Dated: White Plains, New York
         October 29, 2018


            **ECKERT SEAMANS CHERIN & MELLOTT, LLC**

            By: */s Christopher F. Graham*_____
                Christopher F. Graham, Esq.
                Sarah H. Morrissey, Esq.

                10 Bank Street, Suite 700
                White Plains, New York 10606
                (914) 949-2909
                cgraham@eckertseamans.com
                smorrissey@eckertseamans.com

                *Attorneys for Adjusted Debtor Defendant Suffolk*
                *Regional Off-Track Betting Corporation*